Filed 7/20/26  P. v. Singh CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HARMANPREET SINGH,<br><br>    Defendant and Appellant. | F088513<br><br>(Super. Ct. No. F22900258)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Harmanpreet Singh was convicted by jury of first degree murder, corporal injury on a former dating partner, and assault with a firearm. On appeal, he contends (1) the trial court erred by failing to hold a second competency hearing, (2) defense counsel rendered ineffective assistance by failing to introduce evidence of his mental illness to show he lacked the specific intent to kill, and (3) the trial court erred by admitting body camera footage into evidence. We affirm.

## PROCEDURAL SUMMARY

The District Attorney of Fresno County filed an information on February 8, 2024, charging defendant with the murder of Gurpreet Marahar[1] (Pen. Code, § 187, subd. (a);[2] count 1), corporal injury on a former dating partner (§ 273.5, subd. (a); count 2), and assault with a firearm (§ 245, subd. (a)(2); count 3). It was alleged that defendant personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) as to count 1. It was further alleged that defendant personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury during domestic violence (§ 12022.7, subd. (e)) as to counts 2 and 3.

The jury found defendant guilty on all counts and found all enhancements true on June 21, 2024. The trial court sentenced defendant to 25 years to life on count 1, plus an additional term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)) on August 15, 2024. The sentences on the remaining counts were imposed and stayed under section 654.

Defendant filed a timely notice of appeal.

---

[1] Many of the individuals in this case share the same surnames. We refer to these individuals by their first names to avoid confusion. No disrespect is intended.

[2] Undesignated statutory references are to the Penal Code.

**The Prosecution's Case**

### *Defendant and Gurpreet's Relationship*

Gurpreet's family owned a convenience store (the store) in Clovis. Gurpreet and her sister, Manpreet, worked at the store in January 2022. Defendant and Gurpreet knew each other and were previously in a dating relationship. Defendant eventually started "harassing" Gurpreet, including visiting her at the store. Manpreet went with Gurpreet to the police station to file a complaint against defendant for harassment.

### *Gurpreet is Shot at the Store*

Gurpreet was working at the store on the evening of January 11, 2022. Gurpreet was on the phone with her ex-boyfriend, Gurvinder Singh. Singh heard the sound of the store's door opening, followed by Gurpreet telling someone to leave. Gurpreet screamed before the phone disconnected. A customer at a restaurant nearby heard the sound of a gunshot and saw someone running from the direction of the store.

### *The Store's Surveillance Footage*

The store had a surveillance system recording the inside the store, and law enforcement obtained access to the footage.[3] Defendant is seen walking into the store. Gurpreet was interacting with another customer. Defendant stood behind and waited for about a minute while the other customer finished his purchase and walked out of the store. Gurpreet walked toward defendant to retrieve an item and appeared to exchange words with defendant. Gurpreet walked back behind the cash register counter, and defendant walked to the side of the counter. Defendant pointed a gun directly at Gurpreet and fired a shot, and Gurpreet stooped over. Defendant continued to shoot as Gurpreet

---

[3] The videos from the store's surveillance footage were shown to the jury and are part of the record on appeal.

fell to the ground, and then he turned and swiftly left the store. The surveillance footage was clear enough to see defendant's face.

### Law Enforcement Arrives to the Scene

Officer Jackie Wink of the Clovis Police Department was dispatched to the store's location. Officer Wink was equipped with a body camera, which captures calls for service.[4] When Officer Wink arrived at the store, she found Gurpreet laying on her right side in a pool of blood in the back of the store and attempted to provide aid. Gurpreet was transported to the hospital, where she died. An autopsy revealed Gurpreet sustained one gunshot wound in the left side of her head and one gunshot wound in her torso.

### Defendant's Videos on a Social Media Platform

Law enforcement discovered several videos posted on a social media platform which were recorded by defendant.[5] In one video posted on January 11, 2022, defendant, speaking in Punjabi, referenced Gurpreet and the store where she worked. In this video, defendant believed Gurpreet was cheating on him. He mentioned he tried to commit suicide twice. He stated that he "will be in great trouble" and asked his viewers to support his family in the event he "[did] anything." He further stated, "I don't know how many years I will be sentenced. So I fold hands."

In another video, defendant seemed upset and again referenced Gurpreet cheating on him. He stated in part, "The girls who cheat, boys commit suicide.—I wanted to save life after them. That's why I am taking this step. I was not otherwise eager to do this. Right? And I didn't have something like this. Right? I have taken this step after getting fed up and helpless. I will go and do the task." He also stated he had to "teach her lesson that boys—how to cheat the sons of others' mothers."

---

[4]     The body camera footage was shown to the jury.

[5]     These videos were shown to the jury, and English transcripts of the videos are part of the record on appeal.

4.

One video was recorded just before the shooting. Defendant was walking up to the smoke shop while talking to the camera. He stated, "The one who cheated sons of many mothers, has put straining orders on her husband. Gurpreet Kaur Marahar has done many things. Right? So, I want to settle this today.—So if you love me, make my video viral." He continued, "But today I take responsibility by going live today. This girl disturbed mentally, harassed and she is responsible. Right? So I'm going. Love you, bless you all. So here I am going close to her store." He also stated, "[T]his will be the last video."

In the last video, defendant stated, "I have killed. Done it." He realized he would go to jail.

### *Arrest*

Defendant was arrested at his house without incident later that evening. Defendant told law enforcement where they could find the gun he used. Law enforcement located the gun, a .38-caliber revolver with four spent shell casings. One bullet, found in the chamber, was not fired but had a "primer strike" on it, which indicated the trigger was pulled but the gun malfunctioned and did not fire that bullet. Clovis Police Detective Anthony Puente interviewed defendant and observed behavior consistent with someone under the influence.

## The Defense Case

### *Defendant's Testimony*

Defendant testified he met Gurpreet online on a social media platform and traveled from Ohio to Clovis to visit her. Defendant and Gurpreet got engaged while defendant was visiting. After defendant moved to California, he was contacted by Singh, Gurpreet's ex-boyfriend, who told him that Gurpreet was not a good person and to let her go.

Defendant talked to Gurpreet on the store's phone and on multiple occasions went to the store to talk to her in person. In December 2021, Gurpreet's behavior changed, and

she no longer wanted to speak with defendant. Defendant did not remember much about the date of January 11, 2022, because he was drinking a lot and doing drugs, including crystal meth.

Regarding what was said in the videos posted online, defendant testified he was planning on committing suicide in front of Gurpreet. He had received phone calls threatening him and telling him that Gurpreet was in relationships with "a lot of guys" at the time, and there were videos online of Gurpreet. As a result of these communications, defendant was "really upset." Defendant was also told that Gurpreet was married to someone else as she had not yet divorced her husband.

On January 11, 2022, an unknown caller talked to defendant on the phone while defendant was at home drinking. Defendant was challenged by the caller to go to the store if he loved Gurpreet, and the caller added that "we will find out how much you love her." Defendant went to the store, armed with a gun out of fear of Singh or other people "beat[ing him] up" or killing him, and he would rather shoot himself first. Defendant tried to shoot himself in his car, but the gun did not fire. He then walked into the store with the gun because he intended to attempt to kill himself again. Gurpreet suggested he was not safe because Singh was outside the store, which upset defendant. When defendant asked Gurpreet if she loved him, she told him he made a very big mistake by coming to the store and suggested she could shoot him since he was on her property. Gurpreet then went toward the cash register counter, and defendant was scared as he thought she was going to pick up a gun and shoot him. Defendant then shot Gurpreet, ran out of the store, and called 911, but the call ended.

## DISCUSSION

### I. Competency

Defendant contends the trial court erred by failing to hold a second competency hearing. He argues there was substantial evidence of changed circumstances since the initial competency finding, warranting reassessment. The People disagree, as do we.

6.

### A. Additional Background

A doubt as to defendant's competency to stand trial was declared on October 4, 2022, and the court initiated proceedings pursuant to section 1368.

*Competency Evaluations*

Dr. Luis Velosa examined defendant and issued his evaluation report on October 15, 2022. Dr. Velosa noted defendant "exhibit[ed] serious psychiatric symptoms." Specifically, Dr. Velosa found defendant was suffering from a psychiatric order best classified as "Psychosis NOS," but noted the "possibility of a drug induced psychosis (crystal methamphetamine) or schizoaffective disorder should be considered." Dr. Velosa further noted, "At present the defendant is exhibiting psychotic symptoms in the form of disorganized thoughts, looseness of associations, irrational thinking, paranoid ideas and persecutory delusions. The defendant is also exhibiting some auditory hallucinations."

Dr. Velosa opined defendant was not competent to stand trial, as he was not able to understand the nature and purpose of the proceedings and incapable of cooperating in a rational manner with his counsel in conducting a defense. The report noted that antipsychotic medications were medically appropriate and would most likely restore defendant's mental competency. The report further noted that defendant would deteriorate without treatment and be a danger to himself and others.

Defendant was evaluated by Dr. Malia Sherman on February 17, 2023.[6] In her report dated March 24, 2023, Dr. Sherman opined defendant was unable to adequately understand the nature of the criminal proceedings or to rationally assist counsel in his defense due to his psychosis, and antipsychotic medication was the appropriate treatment. Dr. Sherman noted that in January and February 2023, defendant was 81–100 percent

---

[6] Two reports by Dr. Sherman were based on this evaluation, with one dated March 6, 2023, and the other dated March 24, 2023. Because the latter report appears to be a revision of the former, we only summarize the report dated March 24, 2023.

compliant with taking his psychiatric medication as prescribed, but defendant still presented with paranoia and a disorganized thought process at a level that made him unable to assist counsel in his defense.

In this same report, Dr. Sherman also expressed a concern of "defendant's inability or unwillingness to answer questions adequately, and his possible attempt to malinger for secondary gain." The report noted defendant made a call from jail; the person defendant spoke to advised defendant to claim that he was mentally upset and provided an example of someone who was sentenced to a 20-year sentence but was released in seven years. Her report further noted that jail healthcare provider records stated that defendant was seen " 'to be very social and interacting appropriately. Per officers, [defendant] has stated to them that he is fine but he is "playing the game" in order to get less time as [he] is here for murder.' " Dr. Sherman then stated, "The defendant's insufficient answers to questions, combined with his possible attempt to malinger for secondary gain, raises the question of if he was intentionally withholding information during this evaluation in an attempt for secondary gain. This is possible, but even if that is the case, it is also quite likely that he would continue to respond in a similar manner in the courtroom, which would still make him unable to assist council [*sic*] in his defense. In addition, symptoms of paranoia, disorganization, and suicidal and homicidal intent were documented prior to the incident." (Underlining omitted.)

Dr. Sherman conducted another competency evaluation on September 6, 2023, and issued her report on September 15, 2023. In this report, she noted it was discovered in August 2023 that defendant had been missing 90 percent of his morning medication, so defendant's medication schedule was changed. The report further noted that defendant exhibited considerable improvement since her last evaluation, which was likely a result of him taking his medication and staying sober while incarcerated. The report also noted that defendant reported he had stopped taking his medication because his condition had improved and he felt he no longer needed it. Dr. Sherman expressed the concern that it

was likely defendant will decompensate again if unmedicated. Dr. Sherman ultimately opined defendant was "able to adequately understand the nature of the criminal proceedings and to rationally assist counsel in his defense" at the time of the evaluation. She further opined antipsychotic medication is medically appropriate for defendant.

### Criminal Proceedings Reinstated

The court found defendant competent to stand trial and reinstated criminal proceedings on September 28, 2023.

### Marsden Hearings

The trial court held a *Marsden*[7] hearing on February 16, 2024. When the court inquired into defendant's reasons for wanting a new attorney, defendant stated his concerns were that she was a woman and she made a comment that "not only ladies cheat, you guys as men also cheat." He also stated his counsel took the circumstances of his case personally and "to heart" since she was a woman. He further stated defense counsel was "very rude" and "really upset," and he could change attorneys if he so desired. He told the court he did not want his next attorney to be a woman either "because I feel like the woman attorneys are taking it personally because they are women." Defense counsel confirmed she may have stated "something about both genders equally being liable to cheating" but denied feeling personally so offended by the charges that she could not fairly represent defendant. The court denied defendant's *Marsden* request, noting that defendant was "simply a misogynist" who could not "tolerate a woman telling him anything" and any deterioration in the relationship was caused by defendant's behavior, defiant attitude, and sexist opinion.

At another *Marsden* hearing on May 2, 2024, defendant stated he believed defense counsel was not properly representing him in the case, she did "not come and visit [him] in jail as quite [*sic*] often," and she was rude to him. Defendant also stated, "As a women

---

[7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[*sic*], she's taking this case personally to herself." Defense counsel stated she had visited defendant approximately 20 times, and she denied being rude to defendant. Defense counsel further stated that defendant did not believe he was facing a sentence of 50 years to life. Defendant stated that he believed "everybody is trying to kill [him]."

The court held another *Marsden* hearing on June 6, 2024, at which defendant again stated he believed defense counsel was not properly representing him. Defendant explained she was not properly representing him because she was a woman and took his story personally. Defendant further explained that he thought defense counsel was "working for the District Attorney's Office rather than [him]." He also expressed that he felt "like she's challenging me and making me feel jealous to keep on trying and then she stares at me in a rude manner after we've done a *Marsden* hearing and she ignores me, and then I feel uncomfortable afterwards talking to her after I've done a *Marsden* hearing." (Italics added.) Defense counsel denied that behavior and assured the court that she was not working for the district attorney's office.

The court held a final *Marsden* hearing on June 11, 2024, at which defendant again asserted that defense counsel was working for the district attorney's office and took his case personally because she was a woman.

*Defendant's Trial Testimony*

During his trial in June 2024, defendant testified that he was "taking medicine" at the time of his testimony. He also testified, "I have medicine. It's like it has little bit drugs in there, it's for my mental health issues that I'm taking, it's for paranoia." He added that he was not taking his medication on January 11, 2022.

*Presentencing Mitigation Report*

Defendant filed a mitigation report on August 15, 2024. The report, authored by two social workers, detailed defendant's background. The report noted that jail records "indicate an inconsistent on-again, off-again relationship towards taking his antipsychotic medications" and defendant "often makes the decision not to" take his medications. The

10.

report also stated that "a lot of the mental health symptoms which had been described in the earlier reports where [defendant] was found incompetent were coming back into full swing and easily apparent to the naked eye during this assessment."

### *B. Applicable Law and Standard of Review*

" ' "Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent." ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 464; see § 1367, subd. (a) ["A person shall not be tried or adjudged to punishment or have their probation, mandatory supervision, postrelease community supervision, or parole revoked while that person is mentally incompetent."].) Under both standards, "a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*People v. Rodas* (2018) 6 Cal.5th 219, 230 (*Rodas*), quoting § 1367, subd. (a).)

"[G]enerally speaking, when a defendant has already been found competent to stand trial, 'a trial court need not suspend proceedings to conduct a second competency hearing unless it "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.' " (*Rodas, supra*, 6 Cal.5th at p. 234.) "[W]hen a competency hearing has already been held, 'the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state,' particularly if the defendant has 'actively participated in the trial' and the trial court has had the opportunity to observe and converse with the defendant." (*Ibid.*)

" ' " 'When a competency hearing has already been held and defendant has been found competent to stand trial … a trial court need not suspend proceedings to conduct a second competency hearing unless it "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that

finding.' " ' " (*People v. Ng* (2022) 13 Cal.5th 448, 531.)  "We review a trial court's determination concerning whether a new competency hearing must be held for substantial evidence." (*Ibid.*)

### C. Analysis

Defendant contends a second competency hearing was warranted because there was a substantial change of circumstances.  Defendant highlights a part of the September 2023 report, in which Dr. Sherman noted defendant reported he had stopped taking his medication about one week before the evaluation.  Dr. Sherman also noted a discontinuation of medication was "concerning" because it was likely that defendant would decompensate.

We are not persuaded that there was a substantial change of circumstances warranting a second competency hearing.  In the September 2023 report, Dr. Sherman concluded that defendant was able to adequately understand the nature of the criminal proceedings and to rationally assist counsel in his defense.  The report noted that defendant's psychotic symptoms had significantly decreased, likely as a result of defendant "taking antipsychotic medication and remaining sober while incarcerated." Further, there is evidence that defendant had returned to taking his medication by the time of his trial in June 2024, since his trial testimony included that he was taking his prescribed medication for mental health issues, including paranoia.  Moreover, we have found no evidence in the record showing whether defendant was taking his medication between the September 2023 report and his trial in June 2024.

Defendant argues his statements about defense counsel during the various *Marsden* hearings should have raised a bona fide doubt to the trial court as to defendant's incompetence.  These statements include his persistent belief that his defense attorney, who was a woman, had personal antipathy toward him based on her gender so much so that he suspected defense counsel was instead working for the prosecution.  At another point, defendant accused defense counsel of making him "feel jealous."  Defendant had

12.

also claimed defense counsel did not visit him enough, when she had visited him 20 times by the time he made that statement, and refused to accept that he faced the possibility of a 50-year-to-life sentence. Finally, defendant told the court he felt "like everyone is trying to kill [him]." From these statements, defendant asserts on appeal that "a picture is painted of a defendant who … lost his competence due to his decision to discontinue the medication as evidenced by the display of the very symptoms of decompensation that the mental health professionals had identified."

These statements fail to raise a bona fide doubt as to defendant's competence. It is well settled that a defendant's bizarre actions or statements alone are insufficient to raise a bona fide doubt. (See *People v. Mickel* (2016) 2 Cal.5th 181, 202 ["To raise a doubt ..., we require more than 'mere bizarre actions' or statements, or even expert testimony that a defendant is psychopathic, homicidal, or a danger to him- or herself and others."].) While defendant's statements during the *Marsden* hearings show an unwillingness to work with his counsel, the relevant inquiry is whether his statements suggest he was *incapable* of assisting counsel in his defense as a result of his mental illness. (See *Rodas, supra*, 6 Cal.5th at p. 231; *People v. Ghobrial* (2018) 5 Cal.5th 250, 270 ["the evidence must bear on the defendant's competency to stand trial, rather than simply establish the existence of a mental illness that could conceivably affect [the defendant's] ability to understand the proceedings or assist counsel"].) Defendant's statements fall short of this standard as they clearly show an unwillingness to work with his particular counsel. (*People v. Parker* (2022) 13 Cal.5th 1, 29 ["An uncooperative defendant is not tantamount to an incompetent one."]; *People v. Lewis* (2008) 43 Cal.4th 415, 526 [competency hearing not required when a defendant's lack of cooperation with counsel stemmed from an unwillingness rather than inability], disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919–920.)

Relying on *Rodas* and *People v. Murdoch* (2011) 194 Cal.App.4th 230 (*Murdoch*), defendant argues a bona fide doubt may be gathered from a combination of the

September 2023 report, in which he stated he intended to discontinue his medication, as well as his bizarre statements at his *Marsden* hearings. *Rodas* and *Murdoch* are distinguishable.

In *Rodas*, the defendant, who had previously been declared incompetent to stand trial due to his mental illness, was determined to be competent after several months of treatment with antipsychotic medication. (*Rodas, supra*, 6 Cal.5th at pp. 223–224.) His competence was "effectively conditioned" on his continued usage of his medication. (*Id.* at pp. 235, 232.) Defense counsel informed the trial court that she had developed a doubt as to the defendant's competence from recent communications with him. (*Id.* at p. 227.) Defense counsel explained to the trial court that her doubt was based on the defendant's intention to change from their agreed-upon defense strategy, as well as his incoherent justification for the change of strategy. (*Ibid.*) Defense counsel also stated to the trial court that the defendant told her he was no longer taking his medication. (*Ibid.*) The court asked the defendant if he was taking his medication, and the defendant replied in part, " 'No, your Honor, I've been doing without the medication. I've been doing fine. I've been getting along well. I've been there about a year already. I returned from Atascadero Hospital since May of last year and I've been doing fine. I have been doing without my medications." (*Id.* at p. 229.) The high court determined the evidence before the trial court sufficiently demonstrated a change of circumstances warranting a new competency hearing. (*Id.* at p. 235.)

Here, the only evidence before the trial court showing defendant stopped taking his medication was the September 2023 report, in which Dr. Sherman noted defendant had stopped taking his medication for one week prior to the examination. Defense counsel did not inform the trial court that she had a doubt as to defendant's competence at any point after the September 2023 report. Thus, unlike in *Rodas*, defendant was not questioned by the court as to whether he was still taking his medication. Nor was the court required to. As we have stated above, defendant's statements at the *Marsden*

14.

hearings were not so bizarre that the court should have had a doubt about whether defendant was capable of communicating rationally with his counsel.

In *Murdoch*, expert reports stated the defendant was competent to stand trial but noted he had stopped taking his medication. The reports expressed concern that the defendant could decompensate and become incompetent without his medication. (*Murdoch, supra*, 194 Cal.App.4th at p. 233.) The trial court found he was not incompetent and reinstated proceedings. (*Id.* at p. 234.) The defendant was permitted to represent himself. (*Ibid.*) Prior to trial, the defendant informed the court that his defense was he believed the testifying witnesses were not human, but rather, angelic beings. (*Ibid.*) He stated he intended to introduce pages from the Bible as exhibits and ask the witnesses if they were "from Sodom and Gomorra." (*Ibid.*) He also intended to ask if the witnesses could shrug their shoulders, since " '[s]houlder blades are symbolic of angelic beings,' " and he believed the witnesses would not be able to shrug their shoulders. (*Ibid.*) The *Murdoch* court held that the defendant's bizarre explanation of his defense, "taken together" with the expert reports, gave rise to a bona fide doubt requiring the court to conduct a competency hearing. (*Id.* at p. 238.)

Here, defendant's statements, while offensive and sexist, were not nearly of the same degree of "bizarre" as those of *Murdoch*. Defendant did not insist on presenting a nonsensical or delusional defense such as the defense advanced by the defendant in *Murdoch*. Although *Murdoch* concluded that a bona fide doubt should have arisen from the defendant's bizarre behavior and statements in light of the rest of the circumstances, we do not reach such a conclusion on this record. And, as stated, defendant's behavior did not evince an inability to understand the nature of the proceedings or rationally contribute to his defense.

We conclude the evidence was insufficient to show a change of circumstances, and the trial court was therefore not required to conduct a second competency hearing.

15.

## II. Ineffective Assistance of Counsel

Defendant contends defense counsel rendered ineffective assistance of counsel by failing to introduce evidence of his mental illness to show he lacked the specific intent to kill. The People contend the record fails to demonstrate ineffective assistance because defense counsel may have had rational tactical reasons for not introducing the evidence, and further, defendant fails to show prejudice. We agree with the People's first contention and reject defendant's claim.

### A. Additional Background

Defense counsel advanced several defenses during closing argument as to why defendant was not guilty of first degree murder. Counsel argued, in part, that defendant "did not actually have time to reflect or [the] ability to reflect," noting he was under the influence of alcohol and methamphetamine. Counsel added, "Imagine what his mental state [was] like when he's unmedicated, and using alcohol, and using methamphetamine. He was kind of a mess on the stand last week, imagine how much of a mess he is when he's under the influence and unmedicated, right." Counsel further argued that Gurpreet provoked defendant, which "may reduce a murder from first degree to second degree." Counsel additionally proffered that first degree murder could be reduced to voluntary manslaughter based on a theory that it was a sudden quarrel or heat of passion. Finally, counsel argued that the circumstances supported the conclusion that defendant acted in either perfect or imperfect self-defense.

### B. Applicable Law

"Murder is the unlawful killing of a human being ... with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.)

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) " 'Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense.' " (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

"Involuntary manslaughter is 'the unlawful killing of a human being without malice aforethought and without an intent to kill.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 884.) "A verdict of involuntary manslaughter is warranted where the defendant demonstrates 'that because of his mental illness ... he did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought).' " (*Ibid.*) "An instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill." (*Ibid.*)

A defendant is " 'free to show that because of his [or her] mental illness or voluntary intoxication, he [or she] did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought). [Citation.] In a murder case, if this evidence is believed, the only supportable verdict would be involuntary manslaughter or an acquittal. If such a showing gives rise to a reasonable doubt, the killing (assuming there is no implied malice) can be no greater than involuntary manslaughter.' " (*People v. McGehee* (2016) 246 Cal.App.4th 1190, 1208; see § 28, subd. (a) ["Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."].)

## C.  Standard of Review

To demonstrate ineffective assistance of counsel, a defendant must show counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's shortcomings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mai* (2013) 57 Cal.4th 986, 1009.) "A reviewing court can begin an ineffective assistance of counsel inquiry with either element and need not address both elements if one is not satisfied." (*In re Tellez* (2024) 17 Cal.5th 77, 88.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai, supra,* 57 Cal.4th at p. 1009.) "All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

### D. Analysis

Defendant first argues his counsel's failure to introduce evidence of defendant's mental illness fell below an objective standard of reasonableness. Specifically, he asserts defense counsel should have called Dr. Velosa and Dr. Sherman as percipient witnesses as to defendant's mental illness based on their clinical findings, and as expert witnesses as to the symptoms typically experienced as a result of defendant's specific condition. According to defendant, such evidence would have supported an instruction authorizing the jurors to consider his mental illness in deciding whether he acted with malice aforethought and/or premeditation at the time of the shooting.

We cannot conclude that there was no rational tactical purpose for defense counsel not introducing evidence of defendant's mental illness. Since defendant indicated his intent to testify in his own defense prior to trial, defense counsel may have been concerned with how introducing evidence of his mental illness could have negatively affected his credibility. Specifically, defense counsel could have been concerned that the jury would doubt defendant's ability to perceive, recall, or describe the events on January 11, 2022. (See *People v. Gurule* (2002) 28 Cal.4th 557, 591–592 ["the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question"].) Further, had defense counsel introduced such evidence, the prosecutor would have been able to question Dr. Sherman on whether defendant's actions and statements suggested he was

18.

"malinger[ing] for secondary gain." Defense counsel could reasonably have been concerned with how such evidence would have affected defendant's credibility with the jury and whether they believed the rest of his testimony, including his other defenses of self-defense and imperfect self-defense. We decline to second-guess defense counsel's tactical trial strategies here. (See *People v. Weaver* (2001) 26 Cal.4th 876, 925 [" '[w]e accord great deference to counsel's tactical decisions' "]; *People v. Scott* (1997) 15 Cal.4th 1188, 1212 ["courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight"]; *People v. Lucas* (1995) 12 Cal.4th 415, 437 ["there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' "].) The record fails to disclose ineffective assistance of defense counsel.

Having reached this conclusion, we need not consider whether defendant was prejudiced by defense counsel's failure to introduce the evidence of mental illness.

## III. Admission of Evidence

Defendant contends the trial court erred by admitting Officer Wink's body camera footage. The People first contend the claim was forfeited on appeal. On the merits, the People contend the court's evidentiary ruling was neither erroneous nor prejudicial. We agree with the People on the latter two contentions.

### A. Additional Background

The prosecution moved to admit into evidence a video, spanning seven minutes and 30 seconds, of footage captured from Officer Wink's body camera. The prosecution stated the footage showed Officer Wink's arrival at the store and Gurpreet lying behind the cash register. The prosecution further stated the footage showed Gurpreet's medical condition after the shooting, as well as the scene of the store as it was prior to first responders moving Gurpreet to provide medical assistance.

Defense counsel objected to the admission of the footage under Evidence Code section 352. In doing so, defense counsel highlighted that the audio captured in the

footage was "quite intense," as there was "very intense labored breathing for the entirety of the video," and stated that the "prejudicial aspect" was "too much." Conditioned on the court believing there was probative value as to the original scene, defense counsel suggested two possibilities: either opting for no sound and/or shortening the footage.

Following argument from the parties, the court indicated that it had watched the footage and noted it was "disturbing." The court added, "I can't say that the probative value is substantially outweighed by the prejudicial effect, and I cannot say that the probative value is such that the jurors would be misled nor can I say that it would be an undue consumption of time." After the court indicated it would order the footage be played without audio, the prosecution offered to shorten the footage. The length of the footage was shortened to three minutes and 30 seconds with audio (the shortened footage).

The shortened footage was shown to the jury during trial. Defense counsel did not object during trial.

The court's instructions to the jury included: "Do not allow bias, sympathy, prejudice or public opinion to influence your decision."

### B. Applicable Law and Standard of Review

Evidence must be relevant to be admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

" 'The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors.' " (*People v. Morales* (2020) 10 Cal.5th 76, 104; see Evid. Code, § 352 [the court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of

misleading the jury"].) " ' "[A] court may admit even 'gruesome' photographs if the evidence is highly relevant to the issues raised by the facts, or if the photographs would clarify the testimony of a medical examiner." ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1272 (*Gonzales*).)

" ' "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory." ' " (*Gonzales, supra*, 54 Cal.4th at p. 1272.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

### C. Forfeiture

The People argue that defendant forfeited the claim on appeal by failing to object to the trial court's ruling admitting the shortened footage. Defendant argues his initial objection, which was to the full-length version of the shortened footage, preserved the issue for appeal.

"As a general rule, a criminal defendant who fails to object at trial to a purportedly erroneous ruling forfeits the right to challenge that ruling on appeal." (*People v. Anderson* (2020) 9 Cal.5th 946, 961; accord, Evid. Code, § 353 [precluding reversal for erroneous admission of evidence unless upon a timely objection].) "The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." (*People v. Morris* (1991) 53 Cal.3d 152, 187–188, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) "[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced

and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.  When such a motion is made and denied, the issue is preserved for appeal." (*Morris,* at p. 190.)

Defense counsel's objection preserved the issue for appeal.  Defense counsel's Evidence Code section 352 argument initially focused on the prejudice resulting from the audio portion and proposed either muting or shortening the length of the footage.  But defense counsel appeared to have conditioned these proposed solutions on if the court "believe[d] that there's still some probative value as to the original scene in how the body was found."  Defense counsel later clarified her position:  "But this video, *especially in its entirety* with the sound on, the Defense's position is it's unduly prejudicial."  (Italics added.)  Thus, while defense counsel emphasized that certain aspects of the footage elevated its prejudice, her objection went at least to the footage's admission in any manner.  Accordingly, we conclude the issue was preserved for appeal and address the merits of defendant's argument.

### D. Analysis

Defendant argues the shortened footage should have been excluded under Evidence Code section 352 because any probative value was substantially outweighed by the risk of undue prejudice.  He further argues the admission of the video rendered his trial fundamentally unfair.  In doing so, he first asserts the shortened footage of Gurpreet on the ground in pain had little, if any, probative value.

Contrary to defendant's claim, the shortened footage possessed substantial probative value.  The shortened footage captured the scene of the store at the time the police officers arrived.  (See *People v. Pollock* (2004) 32 Cal.4th 1153, 1170 ["photographs of the murder victim and the crime scene are always relevant to prove how the charged crime occurred"].)  It showed Gurpreet's position within the store, as well as her having sustained multiple gunshot wounds.  The shortened footage was highly

relevant considering the nature of the offenses as charged. (See *People v. D'Arcy* (2010) 48 Cal.4th 257, 299 [" 'Photographs of a murder victim "are always relevant to prove how the charged crime occurred, and the prosecution is 'not obliged to prove these details solely from the testimony of live witnesses,' " even in the absence of a defense challenge to particular aspects of the prosecution's case.' "].)

Likewise, we reject defendant's related argument that admission of the shortened footage rendered his trial "fundamentally unfair."[8] (See *Bruton v. United States* (1968) 391 U.S. 123, 131, fn. 6 ["An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence."]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229 ["To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial."].) We cannot conclude on this record that there were no permissible inferences the jury could have drawn from the evidence given its high degree of relevance. (See *Albarran*, at p. 229 [" 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.' "], quoting *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.)

Further, the shortened footage was gruesome, but not unduly so.[9] (See *Gonzales, supra*, 54 Cal.4th 1234, 1272 [" 'The photographs at issue here are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes.' "].) While Gurpreet's belabored breathing may still be heard in the shortened footage shown to the jury, it did not sensationalize the alleged crime or unnecessarily play upon the emotions of the viewer. (See *People v. Morales,*

---

[8]  To the extent the People argue this claim was forfeited by defense counsel's failure to object below on this ground, we disagree. (See *People v. Partida* (2005) 37 Cal.4th 428, 435 [a defendant "may argue that the asserted error in admitting the evidence over his Evidence Code section 352 objection had the additional legal consequence of violating due process" without having objected on that additional ground].)

[9]  The shortened footage is included in the record on appeal, which we viewed.

*supra*, 10 Cal.5th at p. 104.)  On this record, the trial court's determination that the prejudicial effect of the shortened footage did not substantially outweigh its probative value was not an abuse of discretion.

In any event, any assumed error in admitting the shortened footage was harmless. (See *People v. Thomas* (2023) 14 Cal.5th 327, 373 [applying *People v. Watson* (1956) 46 Cal.2d 818 standard of harmless error review to Evidence Code section 352 claim]; *Watson*, at p. 836 [reversal for state law error is not warranted unless it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

Defendant asserts the question for the jury was his state of mind.  According to defendant, it is reasonably probable that admission of the shortened footage caused the jury to abandon alternative conclusions.  First, he notes there was a possibility for the jury to instead find him guilty of voluntary manslaughter based on heat of passion, or that the murder was committed in the second degree based on genuine but objectively unreasonable provocation.  He further argues there was evidence in the record supporting the notion that he acted out of self-defense or imperfect self-defense.  Lastly, he argues it is probable that, absent the shortened footage's admission, the jury would have concluded his level of intoxication prevented him from premeditating the murder.

We are not convinced.  First, there was overwhelming evidence from which the jury reasonably found defendant guilty of first degree murder.  The jury viewed the store's surveillance footage, which captured defendant waiting in the store while another customer left before he had a verbal exchange with Gurpreet.  It further captured defendant shooting and killing her without provocation and while she was holding her phone.  The jury also viewed the videos defendant recorded and posted onto a social media website before and after Gurpreet's death confessing to having committed the act.

Moreover, the shortened footage did not capture the shooting, the interaction between defendant and Gurpreet immediately preceding it, or defendant, as he had

24.

already left the store. Considering the evidence in the record, it is not reasonably probable that the shortened footage had any impact on the jury's consideration of defendant's state of mind. To the extent defendant argues the shortened footage may have dissuaded the jury from these other theories out of sympathy, this argument is unpersuasive. The jurors were instructed that they must not let bias or sympathy influence their assessment of the evidence. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 422 [" 'We presume that jurors understand and follow the court's instructions.' "].) On this record, there was no reasonable probability of a more favorable outcome absent the shortened footage's admission.

We conclude that defendant's claim of error fails on its merits, and any assumed error was harmless.

## DISPOSITION

The judgment is affirmed.


HILL, P. J.

WE CONCUR:


DETJEN, J.


MEEHAN, J.

25.